# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 27
The People &c.,
      Respondent,
    v.
Anthony Debellis,
      Appellant.

Matthew Bova, for appellant.
R. Grace Phillips, for respondent.

WILSON, Chief Judge:

The right to the effective assistance of counsel is guaranteed by both the Federal and State constitution and constitutes an "essential ingredient in our system of criminal jurisprudence, rooted deeply in our concept of a fair trial within the adversarial context" (*People v Benevento*, 91 NY2d 708, 711 [1998], quoting *People v Felder*, 47 NY2d 287, 295 [1979]). Here, counsel failed to request a charge on the only defense supported by the

- 1 -

trial testimony, instead seeking (and failing to obtain) a charge foreclosed by the trial testimony. Therefore, Mr. Debellis's conviction must be reversed and a new trial ordered.

***

Anthony Debellis was stopped while driving a friend's car with an expired registration on the Bronx River Parkway. When the officer asked Mr. Debellis for his license and registration, Mr. Debellis provided neither. Instead he pulled his hand out of his jacket pocket, revealing a magazine clip, at which point the officer had Mr. Debellis exit the car. The officer's frisk of Mr. Debellis produced nothing; when the officer asked Mr. Debellis if there were weapons in the car, Mr. Debellis said there were not. The officer searched the car, found a bag with more ammunition and a holster, and asked Mr. Debellis what he was doing with that. Mr. Debellis said he had a fight with his wife and left in a hurry with the bag. On further questioning, Mr. Debellis said he had a permit that had been revoked. Mr. Debellis also provided his brother's name to the police officer rather than his own.

A lieutenant arrived and questioned Mr. Debellis; the lieutenant also searched the car, finding nothing additional. Because Mr. Debellis was unable to get in touch with the registered owner of the vehicle, the police decided the car would be towed. While waiting for the tow truck, Mr. Debellis asked if he could retrieve his phone charger from the car. The officer allowed him to do so, and observed him fiddling under the front seat, though the charger was visible on the passenger seat. The officer then returned to the car to examine the area that Mr. Debellis had been reaching into and recovered a gun from the

area under the front seat.  Mr. Debellis was then placed under arrest. In total, the stop took about two hours. The officer testified that Mr. Debellis was not in any way threatening during this time; the entire two-hour encounter appears on the dashcam video, which is part of the record.

Mr. Debellis was charged with criminal possession of a weapon (PL 265.03 [3]). During opening statements at trial, defense counsel set out the facts that he intended to prove to establish Mr. Debellis's defense: Mr. Debellis's wife threw him out of the house because he was broke and not earning any money, so, "in a fit of desperation," Mr. Debellis took the gun and ammunition for "a perfectly legitimate reason.  He was taking that gun and . . . everything else to bring to a local police department . . . to turn it in because he was broke and because he was desperate and because he had an argument with his wife and he was going to turn it in . . . [t]o get a gift card for turning in weapons."

At trial, both Mr. Debellis and defense counsel admitted that Mr. Debellis had possessed the weapon without a valid license. Mr. Debellis was arrested in November 2016 for misdemeanor violation of the terms of his firearm license, and pled guilty in March 2017, 18 months before his arrest in this case. In addition, Mr. Debellis was subject to an order of protection, dated 14 months before his arrest in this case, that required him to turn in all firearms. Mr. Debellis admitted that he did not do so, instead leaving the weapon in a safe in the home where his wife and children lived.

However, Mr. Debellis's testimony supported his attorney's opening statement as to his defense—that he was taking the gun to surrender it voluntarily pursuant to a gun

buyback program. Mr. Debellis testified that he had been a longtime maintenance worker for the court system, but became addicted to opioids when prescribed them after a car accident which crushed his hand and fingers. As a result of the financial, legal, and marital problems caused by his addiction, at the time of his arrest he was living in the Bronx with his mother. Mr. Debellis testified that on the day of his arrest, he went to the home in Carmel where his wife and two children lived to help plan his son's birthday. Mr. Debellis admitted he was barred from the home by an order of protection, although he clarified that the order did not concern violence against his children or family. According to Mr. Debellis, while he was at the home he and his wife got into an argument about finances, so he took the gun with the intent of bringing it to the Bronx to turn it over to the police through a gun buyback program. Mr. Debellis testified that he had researched gun buyback programs and believed the NYPD program would let him turn in the gun for cash or a gift card. He stated that he was desperate due to his marital and financial issues and that this was the only way he could think of to get money.

Defense counsel asked for a jury charge of temporary and lawful possession. The court refused to give that charge to the jury because Mr. Debellis' possession was not temporary. Mr. Debellis had admitted that he had the gun for over a year after his license was revoked, and temporary and lawful possession requires that the defendant possess the gun "only long enough to dispose of it safely" (CJI2d[NY] Possession—Temporary and Lawful Possession; *see People v Williams*, 36 NY3d 156, 160-161 [2020]). Defense counsel did not request a charge for voluntary surrender under Penal Law 265.20 (a) (1)

(f), which immunizes from prosecution for criminal possession of a weapon persons turning in a weapon "in accordance with such terms and conditions as may be established by [a] . . . police force or department." Instead, after the trial court refused to charge the jury on temporary and lawful possession, defense counsel apparently aimed his closing argument at jury nullification.

The jury, having been presented with uncontested evidence that Mr. Debellis possessed a weapon without a license and no instruction on any defense, convicted him of second-degree criminal possession of a weapon, third-degree criminal possession of a weapon, and criminal possession of a firearm.

On appeal, Mr. Debellis argued that his counsel erred by requesting an instruction on temporary and lawful possession rather than the statutory defense of voluntary surrender (PL 265.20 [a] [1] [f]), and that this deprived him of the effective assistance of counsel. The Appellate Division affirmed (205 AD3d 555 [1st Dept 2022]).

In New York, the standard for effective assistance is "meaningful representation" by counsel (*Benevento*, 91 NY2d at 712). Our standard is more protective than the Federal standard because "even in the absence of a reasonable probability of a different outcome, inadequacy of counsel will still warrant reversal whenever a defendant is deprived of a fair trial" (*People v Caban*, 5 NY3d 143, 156 [2005]). To establish ineffective assistance, a defendant must "demonstrate the absence of strategic or other legitimate explanations" for counsel's allegedly deficient conduct (*People v Rivera*, 71 NY2d 705, 709 [1988]).

Even under the more demanding Federal standard, "[a]n attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance" (*Hinton v Alabama*, 571 US 263, 274 [2014]). We have previously held that a failure to present a crucial defense supported by the evidence constitutes ineffective assistance. In *People v Nesbitt* (20 NY3d 1080 [2013]), the defendant was accused of assault in the first degree. Counsel informed the court on the record that he believed his client had no defense to the charge of first-degree assault, did not request the submission of second-degree assault as a lesser included offense, and essentially conceded to the jury his client's guilt on the first-degree charge (*id.* at 1081). However, the record afforded a "good-faith basis" for finding that the victim's injuries amounted only to second-degree assault (*id.* at 1082). We held that "counsel's error in overlooking that issue rendered his assistance to defendant ineffective" (*id.*).

Here, counsel knew that his client's explanation was that he was traveling to turn the gun in to the NYC gun buyback program. Indeed, in his opening statement, counsel admitted to the elements of the crime of criminal possession of a weapon and offered a defense, explaining that Mr. Debellis, in desperate need of money, was transporting the gun to a police buyback program in the Bronx.

However, after announcing that line of defense and supporting it through Mr. Debellis's trial testimony, counsel failed to request the only jury instruction that would give it any legal weight—a defense of voluntary surrender under PL 265.20 (a) (1) (f).

Counsel premised his case instead on the common-law defense of temporary and lawful possession, which was completely inapplicable given the length of time Mr. Debellis had possessed the weapon in contravention of a preexisting court order that he had to divest himself of all firearms.[1] Even after the court explicitly told counsel that that it would not instruct the jury on temporary and lawful possession because it did not fit the evidence, counsel failed to request an instruction on the statutory defense that fit his client's testimony and counsel's own argument to the jury.

Voluntary surrender under PL 265.20 (a) (1) (f) applies to a person voluntarily surrendering a weapon to the police commissioner or designee of the city, town, or village in which the person resides in accordance with the terms and conditions established by the commissioner or designee. The purpose of this defense is to encourage persons with illegal firearms to turn them in—regardless of how long the person has had them—so as to enhance public safety by reducing the number of illegal weapons in circulation. Unlike the temporary and lawful possession defense, the voluntary surrender defense contains no time limit on possession of the illegal firearm.  That difference was crucial to Mr. Debellis, who

---

[1] Under our precedent, even a few hours of possession is often not sufficiently temporary. In *People v Snyder* (73 NY2d 900 [1989]), we held that where the defendant kept a gun overnight after acquiring it in a bar fight instead of turning it over immediately, the defense was not applicable. Similarly, in *People v Banks* (76 NY2d 799, 801 [1990]), we held that the defendant's decision after coming into possession of the firearm to transport it on the subway to a different borough, where he stated that he intended to dispose of it by throwing it down the sewer, was "utterly at odds with any claim of innocent possession."

testified that he possessed the weapon unlawfully for over a year before deciding to surrender it voluntarily.

Thus, Mr. Debellis' testimony precluded the defense of temporary and lawful possession. However, he would have been entitled to a jury charge on the statutory defense of voluntary surrender if requested by counsel. Mr. Debellis testified that he had researched the NYPD gun buyback program and was on his way to surrender his gun to police in the Bronx, the borough in which he then resided. There is no indication that this would have failed to comply with the terms and conditions of the NYPD gun return program.[2] Although Mr. Debellis falsely told the officer that no weapon was located in the car, that falsehood does not deprive him of his right to have the trier of fact consider whether he was, in fact, on his way to trade the gun for money or a gift card at a buyback program, and did not disclose it to the officer because he was afraid or believed he would not receive any compensation.

The jury, of course, would have had every right not to credit Mr. Debellis's testimony. But even if the trial court believed that Mr. Debellis's testimony was far-fetched, that cannot justify his lawyer's request for a meritless jury instruction instead of an instruction that fit the very theory of the case he announced in his opening statement when Mr. Debellis's testimony supported that—and only that—defense. Where evidence

---

[2] We note that the statutory defense is available to Mr. Debellis as long as he intended to voluntarily surrender the gun in accordance with the statutory requirements. If Mr. Debellis were mistaken as to the terms and conditions of the gun return program, that might affect his credibility but not his eligibility for the defense.

exists upon which the jury could reasonably find that a particular defense applies, questions as to the credibility of the defendant's testimony or inconsistencies in the evidence presented do not disentitle the defendant to an instruction on the defense; those questions of fact are to be resolved by the jury (*see People v Zona*, 14 NY3d 488, 494-495 [2010]). Here, the dissent's identification of facts that could lead one to believe that Mr. Debellis's testimony was not credible makes out a good closing argument for the prosecution to make to the jury—which is exactly the point: the jury was deprived of the opportunity to determine which account was true because counsel failed to seek an instruction that would have made that determination legally relevant. Because the evidence, "viewed in the light most favorable to the accused, sufficiently support[ed] [the] claimed defense," Mr. Debellis would have been entitled to a jury instruction on voluntary surrender (*People v Watts*, 57 NY2d 299, 301 [1982]). That instruction would have allowed the jury to decide the case with proper consideration of the sole defense Mr. Debellis had advanced throughout the trial to justify his actions.

To the extent that there was other trial evidence that contradicted Mr. Debellis's story, this also implicates the important distinction between the Federal standard and our own. If the voluntary surrender defense was unlikely to succeed, Mr. Debellis could have difficulty showing prejudice under the Federal standard. But when attorney error deprives a defendant of a jury charge on the only defense supported by the evidence, it cannot be said that the defendant received a fair trial. We do not require effective counsel merely to shield the seemingly innocent, but to protect the "integrity of the judicial process" by

affording the "[t]he worst criminal, the most culpable individual" the same chance to be heard as "the most blameless member of society" (*People v Donovan*, 13 NY2d 148, 153-54 [1963]). Because counsel failed to provide meaningful assistance, it does not matter whether Mr. Debellis can now show a reasonable probability of a different outcome (*Caban*, 5 NY3d at 156). Under New York's standard, Mr. Debellis was deprived of the effective assistance of counsel.

Moreover, this is not a case of a defendant suggesting we confuse "true ineffectiveness with mere losing tactics and accord[] undue significance to retrospective analysis" (*Benevento*, 91 NY2d at 712, quoting *People v Baldi*, 54 NY2d 137, 146 [1981]). No reasonable strategy could have supported counsel's failure to request a jury charge on the statutory voluntary surrender defense while at the same time pursuing a meritless temporary and lawful possession defense. Voluntary surrender was the only defense applicable to Mr. Debellis's testimony and the very defense counsel alluded to in presenting the case. Instead of requesting this charge, after conceding all elements of the crime, counsel advanced no defense. Although counsel may have implicitly hoped for jury nullification, forfeiting the instruction that would have provided a legal basis for the exact defense supported by trial testimony and counsel's own argument to the jury cannot "reflect[] a reasonable and legitimate strategy under the circumstances and evidence presented" (*Benevento*, 91 NY2d at 713). As our dissenting colleagues recognize, counsel "convincingly portrayed defendant as a sympathetic individual attempting to comply with the law" (dissenting op at 9)—yet failed to request the instruction that would have

identified the law with which Mr. Debellis was attempting to comply, leaving him bereft of a path to acquittal.

Finally, we reject the suggestion that our standard of meaningful representation "viewed in totality" allows us to justify ineffective performance on a core issue at trial via effective performance on ancillary pretrial issues (*Benevento*, 91 NY2d at 712, quoting *Baldi*, 54 NY2d at 147). The fact that counsel presented a "beneficial" plea deal to Mr. Debellis before trial (dissenting op at 9) does not absolve counsel of the responsibility to provide meaningful representation at trial or to pursue the defense supported by Mr. Debellis's trial testimony.[3]

Because Mr. Debellis is entitled to a new trial due to ineffective assistance, we do not address Mr. Debellis's conflict-of-interest argument.

The order of the Appellate Division should be reversed and a new trial ordered.

---

[3] The dissent's observation that Mr. Debellis "was uncooperative and took the stand against counsel's advice" (dissenting op at 10) hardly serves to demonstrate counsel's effectiveness. Only Mr. Debellis could provide any evidence that might have entitled him to an acquittal, and it is incumbent on counsel to inform a defendant that the decision about whether to testify belongs to the defendant, not counsel (*see Brown v Artuz*, 124 F3d 73, 79 [2d Cir 1997]; Rules of Prof Conduct [22 NYCRR 1200.0] rule 1.2 [a]).

CANNATARO, J. (dissenting):

A police officer stopped defendant's car in the Bronx for an expired registration. When asked for identification, defendant failed to provide any, and instead gave a false name. When the officer observed a shiny object that appeared to be a firearm magazine in

- 1 -

defendant's pocket, defendant admitted it was a magazine with eight bullets in it. When asked point blank if he was carrying a gun, defendant said "no." When asked whether there was a gun in the vehicle, defendant responded, "they took it away from me." In truth, however, defendant had concealed a loaded gun under the floor mat on the driver's side of the car. The police did not find the gun during their initial search of the vehicle but did discover a duffel bag filled with 43 rounds of ammunition, a firearm holster, and another firearm magazine. At no time during the stop did defendant mention the loaded weapon under the floormat. Instead, based on his representations to police, he was allowed to return to the car and enter from the driver's side to retrieve a phone charger, placing him perilously close to his concealed weapon.[1] Searching the car once more, police discovered the gun and defendant was arrested. The entire interaction was recorded.

Today the majority holds that defense counsel was ineffective for not requesting a jury charge that would have allowed the jury to find that defendant's possession of the unlicensed gun was lawful because, at trial, defendant claimed for the first time that he was on his way to a police agency to surrender the gun. Because no reasonable view of the undisputed facts supports such a charge, defendant was not entitled to it. Nor was counsel's overall performance deficient. Nevertheless, defendant, who denied having a weapon when asked by the police and who was allowed access to the area where he had hidden a loaded gun based on that false statement, thereby endangering the life of the officer who

---

[1] I do not share the majority's view of what constitutes a "threat" to officer safety (*see* majority op at 3), which apparently does not include a person who lies to police during a roadside stop about having a loaded gun under the floormat and then reaches for it while in the vehicle.

stopped him and numerous nearby civilians, now has his unlawful possession of a weapon conviction reversed by this Court. Because that result ignores the facts, lacks common sense, and is dangerous as a matter of policy, I dissent.

I.

Defendant testified at trial that he knew that an order of protection in favor of his children had been issued against him on August 29, 2018, approximately three weeks before he was stopped by police. The order of protection excluded defendant from the home he previously shared with his wife and children in the town of Carmel in Putnam County. The order also directed defendant to turn in any firearms that he possessed. Defendant further admitted that he did not have a valid firearm permit on the date in question. Nevertheless, that day, defendant went to the house in Carmel and, after arguing with his wife about finances, went to his safe and removed a loaded, 9 millimeter semi-automatic pistol, a magazine with eight 9 millimeter rounds, a bag containing an additional 43 rounds of ammunition, a holster and another firearm magazine because, as he explained, he was "upset." Defendant then brought the gun and ammunition to the Croton Falls train station, where he boarded a train and traveled approximately 30 miles to White Plains, Westchester County. Although defendant did not have a valid driver's license, he nevertheless retrieved a friend's 2016 BMW and proceeded to drive it into Bronx County, where he was stopped by police who noted that the vehicle's registration was suspended. When asked for identification, defendant gave police his brother's name, address and date of birth.

During the stop, police observed a magazine clip in defendant's pocket and, after asking defendant to exit the vehicle, found the bag of ammunition. Defendant explained that he had left his house with the bag after fighting with his wife but repeatedly denied having a gun in the car because, as he testified, "it wasn't gonna do any good telling [the police] I had a gun in the car." But when police allowed defendant to go back into the car to retrieve a phone charger, he did not take the charger from its visible location on the passenger seat but instead spent "some time" rummaging into various areas of the vehicle. Having observed defendant's suspicious behavior, the police searched the car more thoroughly, discovered the loaded firearm under the floormat of the driver's seat, and placed defendant under arrest.

At trial, defendant testified that he was bringing the gun to a police-sponsored gun buyback program and hoped to receive a $200 gift card because he was desperate for money as a result of his addiction to prescription pain medication. He claimed that he was driving directly to a precinct in the Bronx to surrender the gun in compliance with the order of protection that had been issued three weeks earlier. Two prior orders of protection had been issued against defendant in July 2017 and August 2017, but defendant claimed that he never read them and was unaware that they also directed him to turn in his guns.[2]

---

[2] The majority implies that defendant's gun license was revoked when he was ordered to surrender all firearms in November 2016, upon his arrest for violation of the terms of his firearm license (majority op at 3). Although defense counsel and the People appear to have agreed on that fact—and the trial court concluded that the license was revoked on July 23, 2017, when defendant was arrested for accidentally shooting a cab driver—defendant did not testify to it. Rather, consistent with the trial court's conclusion, defendant testified that orders of protection issued against him in 2017 required him to surrender all firearms, but

Defendant acknowledged that he had transported the gun approximately 50 miles and across three counties by the time he was stopped but explained that he was unaware of any gun buyback programs closer to his home.

After hearing this testimony, the trial court denied defendant's earlier request for a temporary and lawful possession charge, noting that defendant admitted that he illegally possessed the weapon in his safe for over a year after he was directed to turn it in, took the loaded gun onto a public train, then secreted the weapon under the BMW's floormat and lied to police about having a gun when directly asked. A jury convicted defendant of second-degree criminal possession of a weapon and related charges, but acquitted him of the charge of criminal possession of a controlled substance in the seventh degree. Defendant now argues, and the majority agrees, that his trial counsel was ineffective for requesting an instruction on temporary and lawful possession—which the majority rejects as "completely inapplicable" (majority op at 7)—rather than seeking an instruction for the so-called statutory defense of voluntary surrender (*see* Penal Law § 265.20 [a] [1] [f]).[3]

---

he claimed that he did not read those orders and was attempting to surrender the firearm three weeks after he learned that he was directed to do so in the August 2018 order of protection.

[3] Penal Law § 265.20 (a) (1) (f) provides that an individual is exempt from prosecution for the crime of criminal possession of a weapon if the

"person [is] voluntarily surrendering such weapon, . . . provided that such surrender shall be made to the superintendent of the division of state police or a member thereof designated by such superintendent, or to the sheriff of the county in which such person resides, or . . . if such person resides in a city, town other than [in the County of Nassau or the towns of Babylon, Brookhaven, Huntington, Islip and Smithtown] to the police commissioner or head of the police

II.

"On an ineffective assistance of counsel claim under the Sixth Amendment to the United States Constitution, a defendant must demonstrate that (1) his or her attorney committed errors so egregious that he or she did not function as counsel within the meaning of the United States Constitution, and (2) that counsel's deficient performance actually prejudiced the defendant" (*People v Gross*, 26 NY3d 689, 693 [2016]).  In contrast, " 'New York's constitutional requirement of effective assistance of counsel is met when 'the evidence, the law, and the circumstances of a particular case, *viewed in totality and as of the time of the representation*, reveal that the attorney provided meaningful representation' " (*id.*, quoting *People v Benevento*, 91 NY2d 708, 712 [1998] [emphasis added]).  As this Court has explained, "[o]ur state standard . . . offers greater protection than the federal test" because, "under our State Constitution, even in the absence of a reasonable probability of a different outcome, inadequacy of counsel will still warrant reversal whenever a defendant is deprived of a fair trial" (*People v Caban*, 5 NY3d 143, 155–156 [2005]).  Nevertheless, this Court has "remain[ed] 'skeptical' of ineffective assistance of counsel claims where the defendant is unable to demonstrate any prejudice at all" (*People v Alvarez*, 33 NY3d 286, 290 [2019], quoting *People v Stultz*, 2 NY3d 277, 284 [2004]).  Moreover, under both the

---

force or department thereof or to a member of the force or department designated by such commissioner or head; and provided, further, that the same shall be surrendered by such person in accordance with such terms and conditions as may be established by such superintendent, sheriff, police force or department."

state and federal standards, " 'the defendant must overcome *the presumption* that, under the circumstances, the challenged action *might* be considered sound trial strategy' " (*People v Honghirun*, 29 NY3d 284, 289 [2017], quoting *Strickland v Washington*, 466 US 668, 689 [1984] [emphasis added]). That is, a defendant bears the burden of " 'demonstrat[ing] the absence of strategic or other legitimate explanations' for alleged shortcomings" (*People v Mendoza*, 33 NY3d 414, 418 [2019], quoting *People v Rivera*, 71 NY2d 705, 709 [1988]).

Defendant has not met his burden here. Indeed, counsel committed no error in the first instance because defendant was not entitled to a voluntary surrender instruction.

Courts are "required to instruct the jury on 'fundamental legal principles applicable to criminal cases in general' and those 'material legal principles applicable to the particular case' " (*People v Watts*, 57 NY2d 299, 301 [1982], quoting CPL 300.10 [1], [2]). In determining whether a jury instruction on a claimed defense is required, "the court must view the evidence adduced at trial in the light most favorable to the defendant, and must provide the requested charge if it is supported by a reasonable view of the evidence" (*People v Williams*, 36 NY3d 156, 160 [2020] [internal citations and quotation marks omitted]). "The critical question…[is] not whether the claimed defense was consistent with the defendant's testimony or with other defenses raised, but whether that defense, viewed separately, was supported by the trial evidence" (*People v Butts*, 72 NY2d 746, 750 [1988]). " 'The rule is that the jury must be instructed on all claimed defenses which are supported by a *reasonable view* of the evidence—not by any view of the evidence, however artificial or irrational' " (*Williams*, 36 NY3d at 160, quoting *Butts*, 72 NY2d at 750). Accordingly, "when no reasonable view of the evidence would support a finding of the

tendered defense, the court is under no obligation to submit the question to the jury" (*Watts*, 57 NY2d at 301).

The undisputed evidence of the encounter introduced at trial established that, when police found the significant quantity of ammunition in defendant's stopped vehicle and directly asked whether he had a weapon on his person or in the vehicle, defendant said no. After denying that he had a weapon and evidently to explain the presence of ammunition, defendant claimed that his firearm had been taken away from him after he lost his permit. Over the course of the stop, defendant never mentioned to police that there was a loaded firearm hidden in the car. In the face of these facts, defendant proffers the explanation that he hid the gun and kept it hidden from police – even though he intended to turn it into the police – because he wanted a "gift card" in return for doing so.[4] Under the circumstances, there is "no reasonable view of the evidence" to support a voluntary surrender charge, even assuming that such a charge is separate from that for temporary and lawful possession (*id.*).[5] Inasmuch as "[a] defendant is not denied effective assistance of trial counsel merely

---

[4] The majority quips that my recitation of facts is the equivalent of a closing argument (majority op at 9), but we needn't debate the facts here: the entire stop was captured on video and shows the defendant repeatedly lying about having a gun, as well as his reaching for it and thereby recklessly threatening the safety of the officers and members of the public.

[5] In fact, in declining the give the temporary unlawful possession charge, the trial judge commented that "while defendant testified that he wished to turn [the gun] over to the police, when faced standing [sic] next to an officer, instead of giving the officer the weapon he stated he didn't have one [a]nd while it might have cost him a [$]450 gift card, to be candid, it would have gone a long way to getting the charge in this case." The reasoning would apply with even more force to the voluntary surrender instruction.

because counsel does not make a motion or argument that has little or no chance of success" (*Caban*, 5 NY3d at 287), counsel was not ineffective for failing to request the charge.

## III.

Evaluating the record as a whole—which the majority fails to do—counsel's overall performance cannot otherwise be deemed deficient. Counsel secured a beneficial plea offer that would have resulted in a sentence of one-to-three years in satisfaction of this indictment as well as two others charging defendant with felonies. When defendant rejected that plea deal despite the overwhelming evidence against him, counsel zealously advocated for suppression of the evidence at a pretrial hearing and sought preclusion of defendant's earlier convictions involving guns and making false statements to police pursuant to *People v Sandoval* (34 NY2d 371 [1974]). At trial, counsel pursued a cogent, multi-pronged strategy, beginning with opening statements and continuing with thorough cross-examinations of the People's witnesses, a direct examination of defendant that avoided introduction of the other felony cases pending against him, a motion to dismiss the charges at the close of the People's case, an application for a jury instruction on temporary and lawful possession—which the trial court was initially inclined to give, despite harboring reservations—and summations in which counsel convincingly portrayed defendant as a sympathetic individual attempting to comply with the law. Counsel consistently argued that, first, defendant possessed the weapon only temporarily, and then, only because he intended to turn it over to police for compensation. In addition, counsel painted defendant as a man broken by addiction in the hope of securing jury nullification. That strategy led the jury to acquit defendant on the controlled substance possession

charge.  Under the circumstances, the record supports the conclusion of the Appellate Division that counsel provided effective assistance to defendant, who was uncooperative and took the stand against counsel's advice (*see Mendoza*, 33 NY3d at 419).

Yet the majority holds that the record before us "affords a good-faith basis for an argument that" a voluntary surrender defense applied and that "counsel's [purported] error in overlooking that issue rendered his assistance to defendant ineffective" (*People v Nesbitt*, 20 NY3d 1080, 1082 [2013]). *Nesbitt* is inapplicable where, as here, defense counsel has not "explained his [erroneous] thinking in plain language on the record" (*id.*), because the mere existence of even a good-faith basis for an argument does not otherwise establish the absence of legitimate strategic objections for the choice not to advance it.  In any event, this Court has not previously examined the voluntary surrender defense, but the Appellate Division has recognized, under Penal Law § 265.20 (a) (1) (f), a "defense of temporary and lawful possession of [a] handgun pursuant to the exemption from criminal liability for a person engaged in the voluntary surrender of a weapon to the authorities" (*People v Watson*, 163 AD3d 855, 861-862 [2d Dept 2018]).  The majority accepts defendant's argument that counsel was ineffective for pursuing a "common law" temporary and lawful possession defense, as opposed to the statutory voluntary surrender defense, which the majority characterizes as a completely separate defense.  However, there is no separate pattern criminal jury instruction for a voluntary surrender defense and *Watson* expressly describes the statutory defense as a type of "temporary and lawful possession" claim (*id.*; *accord People v E.C.*, 195 Misc 2d 680, 683 [Sup Ct, Queens County 2003] ["While the foundation for (a temporary and lawful possession defense) is common law, it

is somewhat codified in Penal Law § 265.20 (a) (1) (f) which allows for people to possess weapons upon voluntarily surrendering them to the proper law enforcement authorities"]; *Watson v Superintendent of Green Corr. Facility*, 2023 WL 6119709, *3 n 10, 2023 US Dist LEXIS 165364, *5 n 10 [ED NY, Sept. 18, 2023, 19-CV-5098 (PKC)] ["it is unclear. . . what the distinction is between a defense based on returning a gun to a Gun Buyback Program and a defense of temporary and lawful possession"]).

Moreover, defense counsel's argument at trial tracked the language of *Watson*: counsel argued that defendant should be deemed to have temporarily and lawfully possessed the weapon during the time that he was allegedly attempting to voluntarily surrender it. Counsel's arguments, when read in the context of the language of *Watson*— the primary case on which defendant relies, but which the majority conspicuously avoids citing—offer scant support for the majority's unwarranted and inappropriate factual finding that counsel was "ignoran[t] of a point of law that is fundamental to [the] case" and "fail[ed] to perform basic research on that point" (*Hinton v Alabama*, 571 US 263, 274 [2014]).[6] Rather, in the absence of any evidence that would support giving the statutory

---

[6] *Hinton* is distinguishable because that appeal followed an evidentiary hearing at which Hinton's trial attorney effectively conceded ignorance of the law (*see* 571 US at 268). Although "defendant is not precluded from commencing a [CPL 440.10] proceeding based on matters outside the [current] record and beyond review on this appeal" (*Mendoza*, 33 NY3d at 419 n [internal quotation marks and citation omitted]), this case is before us on direct appeal. Unlike defense counsel in *Nesbitt*, counsel did not explain his thinking on the record (*cf.* 20 NY3d at 1082). The majority thus has no basis for its inappropriate factual finding that counsel did not request a voluntary surrender instruction simply because he was ignorant of the law—a finding that is both beyond this Court's power to make and belied by the record given that counsel's argument tracked the language of defendant's primary cited authority.

charge as the majority characterizes it, counsel appears to have advanced the same version of this defense that the Second Department endorsed in *Watson*.

*Watson* notwithstanding, Penal Law § 265.20 (a) (1) (f) requires that the surrender of a firearm be made "in accordance with such terms and conditions as may be established by . . . [the] police." The majority states that there is no indication that defendant's turning the gun in to a precinct in the Bronx, where he resided, would have failed to comply with the terms and conditions of the New York City Police Department's gun return program (majority op at 8). However, it is undisputed that the 49th precinct in the Bronx — where defendant claims he was going when he was stopped — did not offer payment in exchange for guns. Even if the statute could be deemed applicable, invoking it would have highlighted the evidence that defendant was not, in fact, travelling towards a precinct that would have supplied him with the cash that was his asserted motivation for transporting the handgun across 50 miles and lying to police about the presence of the gun in the car. Under these circumstances, counsel could have reasonably concluded, as a matter of strategy, that it would be more effective to pursue a temporary and lawful possession defense based on voluntary surrender as described in *Watson*, along with the alternative strategy of seeking jury nullification in the face of overwhelming evidence (*see Mendoza*, 33 NY3d at 417-419).

The majority acknowledges that "a reviewing court must avoid confusing 'true ineffectiveness with mere losing tactics and according undue significance to retrospective analysis'" (*Benevento*, 91 NY2d at 712, quoting *People v Baldi*, 54 NY2d 137, 146 [1981]). However, in presuming that counsel had *no* strategy here and was completely ignorant of

the law, despite counsel's argument at trial that tracked the language of the very precedent that defendant deems most relevant—and without the benefit of a CPL 440.10 motion which could have supplied outside-the-record evidence from which a court might have concluded that counsel truly was acting out of ignorance of the law—the majority demonstrates the very confusion it counsels to avoid.

Finally, the public policy implications of the majority's holding cannot be ignored. The majority insists that "the statutory voluntary surrender defense" was applicable here and implies that defendant should have been acquitted if the jury believed his testimony (majority op at 8-10). The majority's interpretation of Penal Law § 265.20 (a) (1) (f) as permitting a heavily armed defendant to transport an illegal, loaded gun for 50 miles— including on public transit has no logical end point. Indeed, it would apply equally to an individual arrested for firearms possession in Buffalo who claimed to be en route to a gun buyback program in Queens, regardless of the frivolous nature of the person's explanation for transporting the weapon, or to a defendant who stopped off to rob a bank on the way to precinct buy-back program as long as the defendant ultimately intended to turn in the gun. This interpretation of the statute, with its endorsement of reckless handling of firearms and the attendant danger to public safety, cuts against the ultimate statutory purpose of "limit[ing] ready access to weapons used in the commission of crimes with injurious and lethal consequences" (Assembly Mem in Support, Bill Jacket, L 1995, ch 376).

Therefore, I dissent.

Order reversed and a new trial ordered. Opinion by Chief Judge Wilson. Judges Rivera, Troutman and Halligan concur. Judge Cannataro dissents in an opinion, in which Judges Garcia and Singas concur.

Decided November 21, 2023